UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
JEAN-CLAUDE TASSY,                                          :
                                                            :
                         Plaintiff,                         :
           -against-                                        :   20-cv-2154 (BMC)
                                                            :
PETER BUTTIGIEG, U.S. Secretary of                          :
Transportation,                                             :
                                                            :
                         Defendant.                         :
                                                            :
----------------------------------------------------------- X
                                                            :
JEAN-CLAUDE TASSY,                                          :
                                                            :
                         Plaintiff,                         :   21-cv-0577 (BMC)
           -against-                                        :
                                                            :
PETER BUTTIGIEG, U.S. Secretary of                          :
Transportation,                                             :
                                                            :
                         Defendant.                         :
                                                            :
----------------------------------------------------------- X

## MEMORANDUM DECISION AND ORDER

**COGAN, District Judge.**

Plaintiff Jean-Claude Tassy, a former employee of the Federal Aviation Administration ("FAA"), has commenced two suits under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In the first, he alleges that he suffered disparate treatment and a hostile work environment because of his race, color, and national origin. In the second, he alleges that the FAA issued a "Notice of Proposed Removal" in retaliation for his filing a complaint with the agency's Equal Employment Office ("EEO"), forcing him to retire.

Before me are two motions.  First, defendant has moved for summary judgment on the disparate treatment and hostile work environment claims.  The disparate treatment claim is time-barred, for it is based on an alleged failure to train and no discrete acts occurred within the limitations period.  The hostile work environment claim fails on the merits.  On this record, no reasonable jury could find that the conduct occurred because of plaintiff's protected characteristics or that the conduct was sufficiently severe or pervasive to alter the conditions of his employment.  The motion for summary judgment is granted.

Second, defendant has moved to dismiss the retaliation claim.  Although defendant argues that the claim is time-barred, the arguments go well beyond the complaint itself.  Because defendant has not established its affirmative defense at this stage, the motion to dismiss is denied.

## BACKGROUND[1]

Plaintiff identifies as a black man of Haitian origin.  He began working at the FAA in 2012.  For part of that time, he worked as a "Technical Operator" at John F. Kennedy International Airport, but he recalls that he "always wanted to be an FAA inspector."  He thus considered applying for a position as an Avionics Aviation Safety Inspector ("ASI").[2]  Positions were available at the Flight Standards District Office in Farmingdale, New York ("Farmingdale").  Plaintiff spoke to a manager there named Erik Anderson, who encouraged him to apply.  But Anderson also issued a warning.  "Before you get to the office be careful," he said, pointing to his arm.  Because Anderson is black, plaintiff understood this gesture as suggesting that "color is an issue in that office."

---

[1] Unless otherwise noted, the facts below reflect the summary judgment record, viewed in the light most favorable to plaintiff.  The motion to dismiss depends on only one allegation, and it is addressed in the section on that motion.

[2] "Avionics" are the electronic systems in aerospace vehicles.

2

Still, plaintiff landed a job as an "ASI in training" at Farmingdale. The training would take place at three levels. Plaintiff soon passed Level 1, the written and classroom instruction, and Level 2, the observation of inspectors in the field. At Level 3, however, plaintiff needed to perform the work himself, while a trainer observed and evaluated his performance. That level did not go as planned. A year-and-a-half in, plaintiff had completed only 30 percent. Plaintiff's supervisors set a goal of 60 percent by the next quarter, but plaintiff reached only 35 percent. The supervisors again set a goal of 60 percent by the next quarter, but plaintiff again fell short. Later, after nearly two-and-a-half years of training, he was still stuck at 35 percent. Plaintiff remained at Farmingdale for another two years. He never completed his training.

The reason behind that lack of progress is the key dispute in this case. According to plaintiff, the FAA denied him training opportunities because of his race, color, and national origin. Defendant maintains that the problem was plaintiff himself. In this telling, plaintiff struggled to retain what he learned during training, and he failed to take the initiative in setting up training sessions. Thus, both narratives depend on plaintiff's interactions with his trainers.[3]

The FAA eventually assigned specific trainers to work with plaintiff. The first was Raymond Melcer. By all accounts, Melcer was a "gruff" individual, fond of dolling out "rough" treatment to others in the office. Plaintiff contends that Melcer was particularly rough on him. Plaintiff claims that Melcer conducted only a single training, when he "berated" plaintiff with "offensive language." That training occurred at an air show. Plaintiff asked to inspect one of the planes, and Melcer began "derailing" him, stating, "I don't want to f--- this. . . . Why the f--- [do] you want to ask me the questions." Plaintiff also stated, "When you do an aircraft for inspection,

---

[3] The parties dispute whether the trainer or trainee was responsible for arranging training sessions.

3

you are supposed to do this." Melcer responded, "Why the f--- do you need to do this? And I have been doing this thing for f--- 15 years."

Plaintiff also claims that Melcer harassed him in the office. One time, Melcer walked by plaintiff's cubicle and observed that plaintiff used two monitors, unlike many other employees. "Why the f--- do you f---ing need two monitors," Melcer asked. "You need to f---ing come to my cubicle." The relationship remained unproductive.

After Melcer retired, plaintiff had a new assignment with Joseph Rachiele. He, too, was a "rough individual," though less so than Melcer. Plaintiff reports that, when he failed aspects of his training, Rachiele would shout, "You failed, you failed. . . . Failed, failed, failed." Rachiele also became enraged when plaintiff tried to leave for a doctor's appointment before a scheduled training. Rachiele took a stapler, threw it on the ground, and yelled "F this." Plaintiff postponed the doctor's appointment. Later, plaintiff fell so behind that Rachiele suggested that plaintiff would never conclude his training and should consider retirement.

Yet not every interaction was that negative. Unlike Melcer, Rachiele trained plaintiff on "several occasions." He even rearranged his schedule to accommodate a training. He also expressed concern for plaintiff's well-being. One time, he approached plaintiff in a conference room after observing that plaintiff looked tired and withdrawn. He asked if plaintiff was okay, and plaintiff responded that the job was stressful. "Yes, I understand," Rachiele responded. "[Y]ou look very stressed and I'm kind of concerned for you. . . . Is there a possibility of you going back to your previous [job] or are you financially okay that you can possibl[y] retire because this job is doing a lot of damage to you[,] and I am concerned of how you look and you just seem like you are under distress." Rachiele continued: "[P]eople pick careers or take jobs not knowing exactly what is involved. . . . There is nothing wrong in changing your position

4

because no job is worth your health." Rachiele then gave plaintiff a hug, saying, "God bless" and "I love you."

The FAA also assigned plaintiff to a third trainer, Jeff Rose. He never shouted or used profanity. The problem was that the training rarely occurred. Twice, plaintiff asked Rose to take him out, and though Rose initially agreed, the training never occurred. Plaintiff never asked why, but he believes that Rose trained a white colleague on several occasions. In the end, Rose provided training on less than five occasions.

During these assignments, plaintiff still managed to arrange training sessions with others in the office. Conrad DePinto, who plaintiff described as "the only guy who treat[ed] [him] with respect as a human being," provided training on several occasions. Plaintiff also secured training sessions with an inspector named Mark Burnett.

Back at the office, plaintiff encountered more problems. Several other employees, including Rachiele, would never greet plaintiff in the morning, even though they said "good morning" to the other workers. Plaintiff also cites three specific office incidents. In one, an inspector named Shaukat Alvi asked plaintiff whether he had completed an assignment (the "assignment incident"). Plaintiff had not done so, and Alvi grabbed a folder from plaintiff and said, "I will never f---ing come to your cubicle again." Alvi also falsely reported that plaintiff had used profanity in the office.

Plaintiff then cites an incident when a coworker seemingly suggested that he smelled bad (the "smelling incident"). This coworker had an impediment that prevented her from speaking, and when she was in the copy room with plaintiff, she waved her hands in front of her face and grabbed her nose. Plaintiff interpreted the gestures to indicate that he smelled. It was a "terrible day" for him, and he "did not feel good" afterward.

5

The final incident involved a Haitian painting in plaintiff's cubicle (the "painting incident"). One day, a group of unidentified individuals walked by, and one remarked, "Look at that piece of crap art on that wall." Plaintiff removed the painting the next day. He also reported the incident to Anderson, who responded: "You should have never removed the piece of art. Because you should keep this art and keep on fighting."[4]

A few months later, plaintiff contacted an EEO counselor at the FAA. When counseling failed to resolve the issues, plaintiff filed a complaint, and the FAA began a formal investigation. The final agency decision found no discrimination. It also concluded that plaintiff's disparate treatment claim was untimely because the events did not occur within 45 days of his contacting the EEO counselor.

Meanwhile, the FAA had discovered that plaintiff had secretly recorded several conversations with his coworkers and supervisors. Plaintiff received a "Notice of Proposed Removal." Before the FAA imposed any discipline, plaintiff voluntarily retired. He then returned to the EEO counselor, alleging that the FAA issued the Notice of Proposed Removal in retaliation for his filing the EEO complaint. He eventually filed a second complaint, but that, too, ended in an unfavorable decision.

Those two separate complaints spawned two separate lawsuits. In the first, No. 20-cv-2154, plaintiff brought claims for disparate treatment and a hostile work environment. The basis of the disparate treatment claim was an alleged failure to provide training. After defendant moved for summary judgment, plaintiff commenced the second action, No. 21-cv-0577, alleging

---

[4] Although the painting is not in the record, plaintiff describes it as recognizably Haitian.

retaliation and constructive discharge.  Defendant moved to dismiss.  Both motions are now before me.[5]

## DISCUSSION

I. **The Motion for Summary Judgment**

   A. **The Disparate Treatment Claim**

Title VII bans employment discrimination against federal employees based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-16(a).  Before suing under Title VII, however, "a federal government employee must timely exhaust the administrative remedies at his disposal."  Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir. 2008) (quotation omitted).  Those remedies appear in regulations from the Equal Employment Opportunity Commission.  Id. at 74–75.  Generally speaking, these regulations require an employee to contact an EEO counselor within 45 days of an allegedly discriminatory act.  See 29 C.F.R. § 1614.105(a)(1).  If counseling does not resolve the matter, the employee will receive a notice, see § 1614.105(d), and the employee must file a formal written complaint within 15 days of receiving that notice, see 1614.106(a), (b).  Once the employee receives the final agency action, or if no action has been taken and more than 180 days have passed since the filing of the complaint, the employee may commence a suit in federal court.  See § 1614.407(a), (b); see also 42 U.S.C. § 2000e-16(c).

Plaintiff's failure to comply with these procedures bars his claim for disparate treatment.  Plaintiff first contacted the EEO counselor on August 18, 2018, which means that any discriminatory act must have occurred on or before July 4, 2018.  Yet the claim is based on a failure to train, and plaintiff cannot cite a failure that occurred within the limitations period.

---

[5] Plaintiff commenced the first case, No. 20-cv-2154, against then-Secretary Elaine Chao.  Having succeeded her, Peter Buttigieg should be substituted under Federal Rule of Civil Procedure 25(d).  The Clerk is directed to amend the docket sheet accordingly.

All but conceding this point, plaintiff seeks refuge in one of the timing requirement's equitable exceptions – the continuing violation doctrine. Under this doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 155–56 (2d Cir. 2012) (quotation omitted). Although this doctrine applies to hostile work environment claims, it does not apply to "discrete acts" such as "termination, failure to promote, denial of transfer, or refusal to hire." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114–15 (2002). Discrete acts are "separate actionable 'unlawful employment practice[s].'" Id. at 114. So even if the acts are related or are "undertaken pursuant to a general policy that results in other discrete acts," only the acts within the limitations period are actionable. Chin, 685 F.3d at 157.

A failure to train is a discrete act. See Harvin v. Manhattan & Bronx Surface Transit Operating Auth., No. 14-cv-5125, 2018 WL 1603872, at *4 (E.D.N.Y. March 30, 2018), aff'd, 767 F. App'x 123 (2d Cir. 2019); Bright v. Coca-Cola Refreshments USA, Inc., No. 12-cv-234, 2014 WL 5587349, at *13 (E.D.N.Y. Nov. 3, 2014), aff'd, 639 F. App'x 6 (2d Cir. 2015); Thomas v. City of New York, 953 F. Supp. 2d 444, 452 (E.D.N.Y. 2013). The disparate treatment claim thus depends on the failures to train that occurred within the limitations period. Because there are none, the claim is time-barred.[6]

---

[6] Arguably, the hostile work environment claim is time-barred as well, for the parties do not specify a discriminatory act that both contributes to the claim and occurred within the limitations period. See, e.g., Bright, 2014 WL 5587349, at *4. Yet defendant has not raised this affirmative defense, and it is not jurisdictional, so I will deem it waived. See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 76 (2d Cir. 2010) (considering the merits of a hostile work environment claim where the defendant did not raise the issue and one undated act of discrimination arguably occurred within the limitations period).

8

B.    **The Hostile Work Environment Claim**

To establish a hostile work environment under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn v. City of New York, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  This standard "has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).  Only the objective element is at issue here.

To show that discriminatory conduct is sufficiently severe or pervasive, a plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Alfano, 294 F.3d at 374 (quotation omitted).  "The more severe the harassment, the less pervasive it needs to be, and vice versa." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (quotation omitted).  "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality," Alfano, 294 F.3d at 374, assessing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with the victim's job performance," Rivera, 743 F.3d at 20 (alteration adopted and quotation omitted).[7]

This case does not reach the threshold. Broadly speaking, plaintiff relies on five categories of conduct: the assignment incident, the smelling incident, the painting incident, the failure of his coworkers to say "good morning," and the "rough" treatment he received from his trainers. Yet none of these acts, standing alone, was so extreme to "work a transformation of [plaintiff's] workplace" and establish a hostile work environment. Alfano, 294 F.3d at 374; see also Rivera, 743 F.3d at 24 (suggesting that racial epithets would suffice); 3 N. Peter Lareau, Labor & Employment Law § 75.04[3] (2021) ("Despite broad support for the principle that a single, extreme incident can support a racial harassment claim, courts have found few instances where the stand-alone incident was severe enough to support the claim.").

To prevail, then, plaintiff must show that the conduct was sufficiently pervasive. For a series of incidents to qualify as pervasive, they must be "sufficiently continuous and concerted," not merely "episodic." Littlejohn, 795 F.3d at 321 (quotation omitted). Thus, the assignment incident, the smelling incident, and the painting incident are too isolated to establish a hostile work environment. See id. The failure to say "good morning" is simply too mild. See Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006); Matlock-Abdullah v. N.Y. State Dep't of Lab., No. 6:15-cv-294, 2017 WL 5905564, at *13 (N.D.N.Y. Nov. 29, 2017).

Adding the "rough" treatment does not alter the mix. Although it persisted throughout plaintiff's time at Farmingdale, it was still a series of incidents. For his more than four-and-a-half years at Farmingdale, plaintiff cites only two incidents with Melcer, only three with

---

[7] Although some of these cases addressed hostile work environment claims based on sex rather than race, the standard is the same. See Morgan, 536 U.S. at 116 n.10.

10

Rachiele, and only two with Rose. This sort of episodic mistreatment falls short of the continuous, concentrated, and steady barrage of comments that would establish a hostile work environment. See, e.g., Augustin v. The Yale Club of N.Y.C., No. 03-cv-1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (holding that four or five explicitly racist comments over five years did not establish a hostile work environment), aff'd, 274 F. App'x 76 (2d Cir. 2008).

Of course, I cannot evaluate each incident in isolation – I must consider the totality of the circumstances. See, e.g., Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 389 (2d Cir. 2020). But even then, the conduct was not so continuous and concerted to have altered the conditions of the working environment. See Littlejohn, 795 F.3d at 321 (holding that no hostile work environment existed where the employee's supervisor made negative comments about the employee, used "impatient and harsh tones" with the employee, distanced herself when the employee was nearby, declined to meet with the employee, and wrongfully reprimanded the employee); Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d Cir. 2010) (summary order) (holding that no hostile work environment existed where the defendants "wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her").

Even if the conduct *were* sufficiently severe or pervasive, no reasonable jury could conclude that it occurred "because of" his protected characteristics. See Lee v. Colvin, No. 15-cv-1472, 2017 WL 486944, at *9 (S.D.N.Y. Feb. 6, 2017). Plaintiff relies primarily on his alleged mistreatment, which cannot itself suffice. "Title VII only protects employees from improper discriminatory intimidation; it does not reach so far as to protect plaintiffs from

undiscriminating intimidation by bullish and abusive supervisors." Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000).

Here, the record does not support a reasonable inference that the mistreatment occurred because of a protected characteristic. There were no explicit comments regarding plaintiff's national origin, and the only arguable mention of race occurred when Anderson pointed to his arm. Although this evidence is probative, it would not, standing alone, allow a reasonable jury to conclude that the subsequent conduct occurred because of a protected characteristic. Plaintiff does not name any other comment from any of his years at Farmingdale that mentioned his race.

To be sure, plaintiff can rely on "facially neutral incidents" to help create the necessary quantum of proof. Alfano, 294 F.3d at 377. But plaintiff must first "establish[] a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus." Id. The basis in this case is lacking. For instance, Melcer may have "berated" and "derail[ed]" plaintiff, but plaintiff admits that he was "very gruff" to "many people" in the office. Plaintiff even recalled that Melcer "went crazy on" a white inspector, yelling "F this" and "F that" so loudly that plaintiff could hear it across the office. Later, a union representative told plaintiff, "Melcer was rough on me as well."

The same held true for the other trainers. Although plaintiff casts Rachiele as a "rough" individual, plaintiff admits that Rachiele "was generally 'rough' on people." Likewise, plaintiff complains that Rose never took him out for training, but he only "believes" that Rose trained a white ASI – he lacks any evidence that the training occurred. Cf. Brown v. Henderson, 257 F.3d 246, 254 (stating that the fact that men and women were "treated similarly, if badly," would undermine an inference of sex discrimination).

Equally important, the record cannot establish that the trainers treated all ASIs badly, but plaintiff worse. See id. (discussing this possibility). Although plaintiff stresses that he "strongly believe[s]" that the rough treatment occurred because of his background, it is not his belief that matters – it is the evidence on which that belief is based. But he has offered very few facts to substantiate that belief. He notes that DePinto remarked: "Man, for some reason some of the people get really rough on you. Relax, [Jean-Claude], relax. Please relax." Plaintiff also testified that Melcer never yelled at the other employees with dual monitors, and Alvi did not use profanity with others in the office. Against the entirety of the record, these facts do not provide the quantum of proof necessary to support a reasonable inference that the mistreatment occurred because of plaintiff's background. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (noting that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to survive summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff"); cf. Alfano, 294 F.3d at 377 (stating that facially neutral incidents "must be removed from consideration" if they support only an inference that the plaintiff was mistreated but not the inference that it occurred because of a protected characteristic).[8]

On this record, no reasonable jury could find that plaintiff established the elements of a hostile work environment claim. Defendant is therefore entitled to summary judgment in the first case.

---

[8] Although plaintiff also cites an hour-long recording of a conversation with Anderson, the recording does not support plaintiff's position. Anderson acknowledged that Farmingdale could be a "tough" environment. But he did not, as plaintiff contends, acknowledge that the trainers "shunned [plaintiff] . . . because of his protected category status." Anderson instead explained, at length, that the trainers were tough on plaintiff because they wanted to prepare him for the tough work in the field. Thus, the conversation does not support a reasonable inference that the alleged mistreatment occurred because of plaintiff's protected characteristics.

**II.     The Motion to Dismiss**

In his second case, plaintiff alleges retaliation and constructive discharge. Just like the claims for disparate treatment and a hostile work environment, this one requires a federal employee to "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). The "matter alleged to be discriminatory" includes the resignation, which means "the 45-day clock for a constructive discharge begins running only after the employee resigns." Green v. Brennan, 136 S. Ct. 1769, 1774 (2016). And "an employee resigns when he gives his employer definite notice of his intent to resign." Id. at 1782.

The question, then, is when plaintiff gave that "definite notice." In the complaint, plaintiff alleges that, "to avoid further proceedings and the possible loss of his pension, [he] informed the FAA of his interest in an immediate retirement on March 18, 2020, and formally resigned from his position on April 3." Then, "on or about May 6," plaintiff contacted the EEO counselor. Because more than 45 days passed between March 18 and May 6, the claim is time-barred if the "definite notice of his intent to resign" occurred when he "informed the FAA of his interest in an immediate retirement."

Yet it is not clear what plaintiff meant by his "interest" in retiring. According to defendant, that interest was quite definite. Defendant has provided an email from March 18, where plaintiff states: "I am interested in an immediate retirement. Please let me know if you need any further information from me and process my request as promptly as possible." Plaintiff, however, portrays this interest as merely tentative. In a declaration, he states that he sent the FAA *two* emails on March 18: the one expressing his interest in retirement, and another requesting an extension of time to respond to the Notice of Proposed Removal. Plaintiff thus suggests that the FAA understood that he was still deciding. Indeed, the FAA responded to his

14

email by writing: "Attached is a complete . . . retirement application packet. When you decide to retire, please use these forms to begin the process." Once plaintiff consulted with counsel and decided to retire instead of fighting the proposed removal, he submitted the retirement application. That occurred on March 30. According to plaintiff, that date marks the definite notice of his intent to retire, and it was less than 45 days before he contacted the EEO counselor.

Defendant thus goes on to dispute when that contact occurred. Defendant provides a copy of the counselor's report, which indicates that plaintiff made contact on May 15, not May 6 as the complaint alleges. But plaintiff cites a notation in the report stating: "The aggrieved person reached out to a former . . . employee on May 6th and the email and initial contact was not made with the National Intake Unit until May 13, 2020. As a result, the Designated Representative requested [that the] initial date of contact be moved to May 6, 2020."[9]

The parties' perceived need to venture beyond the complaint shows that this is not a timeliness issue that can be resolved in the context of a Rule 12(b)(6) motion. Plaintiff's inadequate pleading does not resolve the issue, either, because timeliness is an affirmative defense. See DiPetto v. U.S. Postal Serv., 383 F. App'x 102, 104 (2d Cir. 2010) (summary order); see also Hardaway v. Hartford Pub. Works Dep't, 879 F.3d 486, 491 (2d Cir. 2018) (holding that the "burden of pleading and proving Title VII exhaustion" for non-federal employees "lies with defendants and operates as an affirmative defense"). It is also unclear whether the May 6 contact warrants some sort of equitable tolling.

Even more fundamentally, the relevant case law suggests that defendant has simply raised an issue of fact that is not resolvable on this motion to dismiss. See Green, 136 S. Ct. at 1782 (describing when an employee gave "definite notice of his intent to resign" as a "factual

---

[9] It is not clear whether the "May 13" reference should in fact be "May 15."

15

issue"); Green v. Brennan, 669 F. App'x 951, 952 (10th Cir. 2016) (holding that an employee gave his definite notice when he "submitt[ed] retirement paperwork," because at that point he could no longer "choose to continue his employment"); cf. Pace v. Alfa Mut. Ins. Co., No. 2:13-cv-697, 2016 WL 4419290, at *4 (M.D. Ala. Aug. 17, 2016) (reasoning in a different context that Green requires the notice to be "definite" and "does not hold that a constructive discharge claim accrues when the . . . employee gives contingent notice that he intends to resign at some unspecified date in the future if attempts to work out a satisfactory alternative are unsuccessful").[10]

In these circumstances, the motion to dismiss must be denied.

## CONCLUSION

Defendant's motion for summary judgment in Case No. 20-cv-2154 [17] is granted. The Clerk is directed to amend the docket sheet and enter judgment, dismissing the case. Defendant's motion to dismiss in Case No. 21-cv-577 [8] is denied.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       May 16, 2021

---

[10] Given the FAA's instruction to submit the retirement packet "[w]hen you decide to retire," as well as plaintiff's email to Anderson requesting an extension of time to respond to the Notice of Proposed Removal, this case involves a more ambiguous notice than the ones in the cases defendant cites. See McGann v. City of New York, No. 12-cv-5746, 2013 WL 1234928, at *1 (S.D.N.Y. March 27, 2013); Shih v. City of New York, No. 03-cv-8279, 2006 WL 2789986, at *6 (S.D.N.Y. Sept. 28, 2006).